[No. F007033. Fifth Dist., Apr. 14, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES RONALD MORGAN, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

James J. Haight, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, W. Scott Thorpe and Terence B. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MARTIN, J.—On September 5, 1985, the Fresno County District Attorney filed an information in superior court charging defendant with rape. (Pen. Code, § 261, subd. (1).)[1] Thereafter, the district attorney filed a first amended information alleging an assault with intent to commit rape as count II. (§ 220.)

After trial, the jury returned a verdict of not guilty on count I (§ 261, subd. (1)) and a guilty verdict on count II (§ 220). The trial court denied defendant probation, sentenced him to state prison for the upper term of six years and imposed a $500 restitution fine. (Gov. Code, § 13967.)

Defendant filed a timely notice of appeal.

FACTS

In 1985, Glynna Morgan (no relation to defendant) and Janet Torrano worked at the Touch of Artistry beauty shop at Marks and Herndon Avenues in Fresno. Around 3 p.m. on April 18, 1985, they looked out the rear door of the shop and saw two people in a parked van. The defendant was on top of the other person, moving the upper part of his body from side to side. When the beauty shop employees went outside, the couple had moved and defendant was sitting in the driver's seat with his pants off. Ms. Torrano approached the driver's window to speak to defendant and saw him wiping off his penis. Defendant said his name was Jim. The other person was sitting in the passenger seat and appeared to be a young boy about 14 or 15 years old with short, black hair and a stocky build. The witnesses thought the passenger looked frightened. At trial, the witnesses identified a 28-year-old woman, S.O., as defendant's passenger.

Defendant was employed by Sullivan Transportation Company in Fresno. He drove a company van and transported handicapped people from their homes to the Kelso Activity Center. S.O. was a 28-year-old severely retarded woman who was a passenger on defendant's route. She was the first passenger to enter defendant's van in the morning and the last passenger to get off at night.

---

[1]All statutory references will be to the Penal Code unless otherwise indicated.

After Morgan and Torrano accosted defendant, he left and took S.O. home. The witnesses noted the name "Sullivan" on the side of the van, took the license number, and contacted the Fresno Police Department. Fresno Police Officer Guy Ballesteroz responded to the scene, contacted the Sullivan Transportation Company, and obtained the names and addresses of defendant and victim. Officer Ballesteroz went to S.O.'s home to inquire about the incident. Officer Ballesteroz had problems communicating with S.O. because she spoke little English and was so retarded. S.O.'s younger sister, S.A., interpreted for the police officer. According to Officer Ballesteroz, "[s]he [S.O.] started off very casual and then when we started asking intimate questions about a possible attack occurring she became emotionally upset." Officer Ballesteroz collected S.O.'s clothing and then accompanied the victim, her mother, and her younger sister to Saint Agnes Medical Center.

Dr. James L. Ver West, Saint Agnes Emergency Room physician, examined S.O. for sexual assault. Dr. Ver West noted S.O. was extremely retarded for her age. She had a very small contusion over her left cheek but no obvious signs of any trauma. Although S.O.'s hymen was not intact, there were no signs of recent injury in the vaginal area. Dr. Ver West prepared a sexual assault kit as part of the examination. However, he was unable to determine whether intercourse occurred.

Rodney H. Andrus, a criminalist with the California Department of Justice Regional Crime Laboratory, analyzed specimens from S.O.'s sexual assault kit. Andrus specifically examined a vaginal swab, rectal swab, items of the victim's clothing, and a pair of defendant's undershorts. Andrus also was unable to conclude whether defendant and victim engaged in sexual intercourse.

Fresno Police Detective Henry Jacobo, Jr., went to defendant's Clovis apartment at 7:30 p.m. on April 18, 1985. After waiving his Miranda[2] rights, defendant told Detective Jacobo he had dropped off his last passenger (S.O.) that day, and then saw one Janet, a woman he knew. He spoke to her for a while and she acted as though she wanted to have sexual relations with him. Defendant then took her in the van to a place behind a store. Before he could do anything, two ladies demanded to know what he was doing. Defendant then left the area and dropped the woman off.

When Detective Jacobo told defendant he did not believe his story, defendant then admitted the girl was S.O. He claimed S.O. was the aggressor; that she had said to him, "Let's go fuck." He claimed she had a history of making

[2]Miranda v. Arizona (1966) 384 U.S . 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974].

advances to people. Many times she had tapped on his arm, pointed to her vaginal area, and nodded her head. She said the words "fuck," "pussy," or "dick." Defendant added he had looked often in the rear view mirror and had seen S.O. engaging in apparent sexual activity with boys in the van. Although defendant intended to have sexual relations with S.O., the ladies from the beauty salon interrupted them before anything happened. Defendant said he had his belt undone, but not his pants. He did not know if any of S.O.'s clothes had been removed.

S.G., S.O.'s youngest sister, testified when S.O. arrived home on April 18, S.G. noticed nothing unusual in her behavior. S.O. went to shower, as usual, and S.G. assisted her. S.O. then went to lie down. S.G. testified S.O. spoke Armenian at home and did not understand sufficient English to use the sexual language attributed to her by defendant. S.A., S.O.'s younger sister, stated S.O. was a mentally retarded 28 year old who was driven to school everyday in the Sullivan bus. S.A. said S.O. had never been to a school for normal children. When S.A. arrived home on April 18, a police officer was present and S.O. "was crying . . . . She was very afraid from the policeman." S.A. also said S.O. spoke Armenian and S.A. had never heard S.O. use the sexual language attributed to her by defendant.

James C. Hitter, a former teacher at the Kelso Activity Center, testified he had worked with S.O. on a daily basis for five months until November 1985. Hitter had never seen S.O. act out in a sexual fashion or use sexual terminology. She spoke English in class.

Debra Lynn Clark testified she was social adjustment coordinator for the Association of Retarded Citizens. She had known S.O. since March 1980 and had never seen her engage in any sexual activity or heard her use sexually explicit language.

Dr. Allen H. Middleton, a clinical psychologist, evaluated S.O. and reviewed reports of previous psychiatric examinations from 1979 and 1980. S.O. registered a social age of four years, three months on the Vineland Social Maturity Scale, a mental age of seven years, seven months on the Peabody Picture Vocabulary Test, three and one-half years of age on a Copy Forms Instrument Test, and an intelligence quotient (IQ) of fifty-five. According to Dr. Middleton, S.O. suffered from microcephalia, i.e., a small head and a compressed brain. However, she had no chromosomal abnormality and was, by chromosomes, a normal female. S.O. was very childlike and did not act in a sexually provocative manner during her interview with Dr. Middleton. Dr. Middleton found S.O. knew some words in several languages and "that's atypical for an individual who is moderately mentally retarded." In Dr. Middleton's opinion, S.O. did not understand the nature or conse-

quences of sexual intercourse. He believed she did not have the capacity to give informed consent to sexual behavior. However, it was possible S.O. might desire sexual intercourse.

Over defense counsel's objections, the trial court allowed the prosecutor to conduct "a demonstration of sorts" with the victim. The court further explained: "She [S.O.] is not called as a witness in this action. She will not take an oath. She will not be asked any questions about the alleged incident or anything other than simple questions concerning, for example, her name, how old she is, and the like.

> "The sole purpose of this procedure is to allow you, the jurors, to observe her behavior, her demeanor, her actions, physical actions and her behavior."

Without taking the oath, S.O. sat in the front row of the spectator section of the courtroom and (1) gave her name; (2) stated she could not spell her name; (3) stated she was five years old; and (4) stated a green purse held up by the prosecutor was yellow.

### Defense

Defendant did not testify or present evidence on his own behalf but chose to rely on the state of the evidence.

### DISCUSSION

### I. DID THE TRIAL COURT ERRONEOUSLY ALLOW THE PROSECUTOR TO EXAMINE THE MENTALLY RETARDED VICTIM?

Defendant contends the trial court erroneously allowed the prosecution to examine the mentally retarded victim absent an oath.

On February 14, 1986, the deputy district attorney proposed to examine the victim to establish her "mental disease, defect or disorder" within the meaning of section 261, subdivision (1).[3] The following exchange occurred

---

[3]At the time of the offense, section 261, subdivision (1) stated: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: (1) Where a person is incapable because of mental disease, defect, or disorder or because of physical disability, of giving consent, and this is known or reasonably should be known to the person committing the act. Notwithstanding the existence of a conservatorship pursuant to the provisions of the Lanterman-Petris-Short Act ... the prosecuting attorney shall prove, as an element of the crime, that a mental disease, defect or disorder or physical disability rendered the alleged victim incapable of giving consent."

between counsel and the court out of the presence of the jury: "[THE COURT:] What do you propose to do, Miss Leary, with [S.O.] if she's called?

"Ms. LEARY [deputy district attorney]: Your Honor, my proposal would be to ask her her name.

"To ask her to spell her name.

"To ask her to identify colors.

"To ask her a couple of questions that relate to counting, to numbers.

"To ask her where she is.

"To ask her how old she is.

"I think that's about all I'll need to do.

"THE COURT: The question that immediately popped to my mind is what kind of an oath do we give her? She really is incapable of consenting or even, from what I understand, it's likely she's incapable of knowing what an oath is and acknowledging it.

"Ms. LEARY: Your Honor, we could do it in the fashion that those are the kinds of questions I would ask if I were attempting to qualify someone to testify as a witness. He is—they are the same kinds of questions that we use. I don't expect her to be able to answer those questions satisfactorily. And, therefore, I don't expect her to be able to qualify.

"But I also feel in this case, because of the nature of the case that she— I don't like using this term for a human being, but I believe she is the most pertinent exhibit in this case.

"THE COURT: Yeah, I understand that and have been sitting here throughout this trial thinking the same thing and worrying about those kinds of questions.

"Even if she can't qualify as a witness, her testimony and appearance are relevant to proof of knowledge or reasonable knowledge on the part of the Defendant.

"Ms. LEARY: Well, I think it is particularly—I think it arguably is. I feel it is because in the statement of the Defendant he said that she was using

the kind of language and the kind of activity that would indicate she does have knowledge of sexual behavior, and that it is sexual behavior, and that she had been approaching him and coming onto him for 24 times—how much—whatever period of time that was.

"And because the law requires that for the Defendant to be found guilty he must know or have reason to know that a person is incapable of giving legal consent, I just feel that some evaluation of [S.O.'s] functioning is absolutely, totally relevant and in line—

"THE COURT: It is. At least, I think it is.

"Mr. MacMichael, you are going to object to all of this on a variety of grounds, including 352, correct?

"MR. MACMICHAEL [deputy public defender]: That's correct ."

The court subsequently allowed the prosecution to examine the victim, explaining to the jury: "Ladies and gentlemen, what we're now going to do is conduct a demonstration of sorts.

"[S.O.] who has been identified a couple of times in this courtroom, is going to be seated in the first chair in the spectator section. I'm going to ask her to stand and answer some questions posed by the District Attorney. And if he chooses, Mr. MacMichael.

"*She is not called as a witness in this action.* She will not take an oath. She will not be asked any questions about the alleged incident or anything other than simple questions concerning, for example, her name, how old she is, and the like.

"The sole purpose of this procedure is to allow you, the jurors, to observe her behavior, her demeanor, her actions, physical actions and her behavior.

"*Because she is not a witness, she will not take the witness stand and she will not be given an oath.*" (Italics added.)

The following exchange occurred during that examination: "BY Ms. LEARY:

"Q. Can you stand up, [S.O.]?

"A. Yeah.

"Q. Thank you. Can you say your name for us?

"A. [S.O.].

"Q. Okay. And can you spell your name, [S.O.]?

"A. (Negative head shake.)

"Q. Is that a 'yes' or a 'no'?

"A. No.

"Q. All right. How old are you, [S.O.]?

"A. Five.

"Q. Okay. And [S.O.], could you sit down for just a minute?

"A. Yeah.

"Q. I want to show you something I want to ask you about.

"Do you see this little thing I have here?

"A. Yeah.

"Q. Do you know what color that is?

"A. I think, ye-llooow.

"Q. Yellow?

"Are you going to a party today?

"A. Yeah.

"Q. Where is the party?

"A. Sch-oool.

"Ms. LEARY: Thank you very much, [S.O.].

"Those are all the questions I have. Just a minute, okay?

"Mr. MacMichael: I have no questions.

"THE COURT: Okay. . . .

"MS. LEARY: Thank you.

"[S.O.]: Thaaa-nk you.

"MS. LEARY: You are welcome.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Your Honor, for the record, I would like to note that the object I held up and asked [S.O.] to identify the color was a small purse which, in my vision, appears to be green.

"THE COURT: Yes. The record will reflect that the item shown to [S.O.] was green."

Defendant contends on appeal the entire procedure was erroneous because (A) the victim did not testify under oath; (B) the probative value of the examination was outweighed by its prejudicial effect; and (C) the court denied defendant's fundamental constitutional right to cross-examine the victim.

In our view, defendant's contentions must fail. ▮ In sum, he argues S.O. was called to testify without first taking the requisite oath required by Evidence Code section 710. However, a review of the record convinces us S.O. was not a witness and never testified. Without intending to belittle or denigrate S.O. in any way, it was apparent to both counsel and the trial court, that S.O. could not testify as a witness. She was simply incapable of testifying as a witness, because of factors completely beyond her control, i.e., the degree of her retardation. S.O. could not qualify as a percipient witness to the events which occurred on April 18, 1985. The trial court made this perfectly clear to trial counsel and to the jury prior to S.O.'s appearance in the trial (see *ante*). S.O. was not called as a witness, but rather, was produced by the prosecution as an exhibit, demonstrative evidence of an essential element of the substantive charge against defendant, that S.O. was incapable "because of mental disease, defect, or disorder . . . of giving consent [to sexual intercourse], and this is known or reasonably should be known to the person committing the act." Thus, there was no requirement the provisions of Evidence Code section 710 be met. Nor may it properly be argued that S.O. "testified" to any facts relevant to the truth or falsity of the events alleged to have occurred on April 18, 1985. She was asked only innocuous questions such as her name, whether could she spell it, her age, the color of a purse and the like. She was neither asked nor volunteered any information regarding the subject incident.

■ Defendant further argues he was denied his fundamental constitutional right to cross-examine the victim. First, for the reasons stated above, defendant had no right to "cross-examine" S.O. She was not a witness. More importantly, defendant misstates the record. At the conclusion of the prosecutor's questions to S.O., defense counsel volunteered "I have no questions." As we shall conclude in part II of this opinion, defense counsel's election not to question S.O. was undoubtedly well taken and a sound exercise of his discretion as trial counsel. We cannot imagine how further questioning of S.O. regarding her competence, prolonging her appearance before the jury, particularly in light of the other evidence in this regard, could have inured to the benefit of defendant.

■ Defendant also contends the probative value of the examination was substantially outweighed by its prejudicial effect. (Evid. Code, § 352.) He specifically contends: "There was a plethora of evidence as to [S.O.'s] mental retardation and consequent inability to consent to sexual intercourse. The witnesses who had any verbal contact with her stated that she was obviously retarded. Her two sisters so testified. . . . Her teachers so testified. . . . Dr. Middleton gave expert testimony on the subject. . . . [S.O.'s] own examination was therefore entirely superfluous and cumulative on the issue and its probative value was minimal. Its prejudicial effect is obvious. It is difficult to imagine anything more calculated to tug at the jurors' heartstrings than the pathetic answers given by this 28 year old woman with a mental age of seven, whom witnesses described as looking like a short, stocky, fifteen year old boy, and who suffered from microcephalia."

The trial court overruled defense counsel's objection under Evidence Code section 352 stating, "As to 352 the Court finds that the evidence is relevant and that its probative value, given the nature of this case and the requirements of 261(1), is substantially greater than the probability of prejudice. That its admission will not necessitate the undue consumption of time or create a substantial danger of a—of misleading the jury or confusing the jury. Quite to the contrary. I think it goes right to the issue. It's relevant evidence. The person's demeanor and behavior is relevant in this case."

■ The trial court has wide discretion under Evidence Code section 352 whether evidence should be excluded as cumulative, remote, confusing or misleading. (*People* v. *Dreas* (1984) 153 Cal.App.3d 623, 634 [200 Cal.Rptr. 586].) The trial court's exercise of discretion will not be reversed on appeal absent a clear showing of abuse. (*People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1042 [182 Cal.Rptr. 197], disapproved on another point in *People* v. *Smith* (1984) 35 Cal.3d 798, 808 [201 Cal.Rptr. 311, 678 P.2d 886].)

■ S.O.'s appearance in court was brief and did not necessitate the undue consumption of time. From the record it would appear she was in

and out of the courtroom in five or six minutes. As to relevancy and probative value, she was obviously the most compelling evidence on the issue of whether or not she was capable of giving consent to sexual intercourse. With respect to the "danger of undue prejudice," it was unlikely S.O.'s responses to these questions or conduct led the jury astray and caused them to convict an innocent man. In light of defendant's admissions to Detective Jacobo and the testimony of Glynna Morgan and Janet Torrano (*ante*), evidence of defendant's culpability was overwhelming. In our view, admission of this evidence, S.O.'s appearance in court for the limited purpose heretofore described, coupled with the trial court's admonishment to the jury in advance of S.O.'s appearance, did not constitute an abuse of discretion under Evidence Code section 352.

### II-III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Hamlin, Acting P. J., and Ballantyne, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 15, 1987.

---

*See footnote on page 29, *ante*.