911 P.2d 735

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Roy KAIAMA, Jr., Defendant–Appellant.**

**No. 16466.**

Supreme Court of Hawai'i.

Feb. 23, 1996.

Keith E. Tanaka, on the briefs, Wailuku, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, Office of the Prosecuting Attorney, on the briefs, Wailuku, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Following a jury trial in the Second Circuit Court, the defendant-appellant Roy Kaiama, Jr., was found guilty of Murder in the Second Degree, in violation of Hawai‘i Revised Statutes (HRS) § 707–701.5 (1993),[1] and sentenced to a mandatory term of life imprisonment with the possibility of parole. Kaiama filed a timely appeal from his judgment, conviction and sentence. On appeal, he alleges that the trial court erred in: (1) allowing the plaintiff-appellee State of Hawai‘i (the prosecution) to use co-defendant Reginald Medeiros as a "physical exhibit" to show that Medeiros was physically smaller than Kaiama; (2) excluding evidence of Medeiros's drug dealing in the gay community, as well as evidence that a pistol was found in Medeiros's car; (3) failing to instruct the jury on manslaughter; and (4) charging the jury with the prosecution's proposed jury instruction regarding accomplice liability. For the reasons set forth below, we disagree with all of

1. *See infra* note 7.

Kaiama's points of alleged error on appeal and affirm.

## I. *BACKGROUND*

On the morning of November 22, 1991, a dead body was found on the shoreline of a beach cove called Hale Nanea, next to the Kahului Harbor on the island of Maui. The body was located adjacent to a jetty of rocks that led from the shoreline outward into the ocean. Detective Antonio Funes of the Maui Police Department (MPD) was assigned to investigate the discovery of the body. Detective Funes assembled a homicide investigation team and proceeded to the beach where the body was located. When the police arrived, the body's head and neck were embedded in the sand and its torso and legs were exposed. Upon removing the body from the sand, the police observed numerous abrasions and lacerations on the individual's face. An autopsy report revealed that the primary cause of death was drowning and a contributing cause was multiple external injuries to the head and body.[2]

The deceased was later identified as Jerald Canada. According to witnesses, on the previous evening, at approximately 10:50 p.m., Canada had arrived at Lopaka's Bar and Grill (the bar) where he worked as a part-time bartender. At the time, he was not on duty and was served a couple of beers. Defendant Kaiama and co-defendant Medeiros arrived at the bar shortly thereafter. Medeiros attempted to order drinks for himself and Kaiama; however, an employee of the bar testified that only Medeiros was served because Kaiama was underage.[3] Kaiama and Medeiros were seen talking across several tables to Canada, who ended up joining them at their table. The three continued to talk for approximately forty minutes until the bar closed at 1:00 a.m. Around that time, Canada told one witness that he planned on going to the Hang Loose Lounge and, after that, to the beach where he was going to sleep. After the bar closed, Canada, Kaiama, and Medeiros, along with a waitress from the bar and one of her male friends, went to the Hang Loose Lounge where they drank until approximately 2:00 a.m. on November 22.[4]

On November 23, 1991, at approximately 12:40 a.m., the Maui police contacted Kaiama and requested that he come to the station for questioning. Kaiama complied with the request, and his mother drove him to the station. At approximately 1:10 a.m., Detective Funes interviewed Kaiama with respect to his knowledge, if any, of the circumstances surrounding Canada's death. Detective Funes began the interview by informing Kaiama of the nature of the investigation, as well as his *Miranda* rights. Kaiama then executed a MPD Warning and Waiver Form (Form 103) and proceeded to give what was to be his first of three contradictory statements to the police.

### A. *First Statement*

In his first statement to the police, Kaiama provided the following story: On the night in question, he and Medeiros went to the bar, where they had some drinks and subsequently met Canada. After the bar closed, the three went to the Hang Loose Lounge together where they had some more drinks. When the Hang Loose Lounge closed, at approximately 2:00 a.m., they went out the back entrance and into an alley where their vehicles were parked. At that point, he went home and was not aware of what happened to Canada. This statement was not tape-recorded.

### B. *Second Statement*

Detective Funes continued to interview Kaiama and recorded his next statement.[5] In his second statement, Kaiama provided

---

2. Approximately twenty-five pre-death injuries were located on the victim's face, head, shoulders, arms, and back. These external injuries included bruises, scrapes, and skin tears.

3. According to Kaiama, who made three statements to the police, *see* Parts I.A., I.B., and I.C. *infra*, he did, in fact, drink at the bar.

4. Apparently, while at the Hang Loose Lounge, Medeiros purchased alcohol for Kaiama.

5. Before Kaiama made his second statement, Detective Funes again advised Kaiama of his *Miranda* rights. At this time, Kaiama indicated that he had earlier read, understood and signed a MPD Form 103.

Detective Funes with a different version of events that transpired on the night in question. Kaiama admitted to lying in his first statement, but stated that he wanted to tell the truth this time. In this statement, Kaiama claimed that, after leaving the Hang Loose Lounge, Canada asked Kaiama and Medeiros to follow him to the beach. They agreed, and instead of going home directly after leaving the Hang Loose Lounge as he indicated in his first statement, he and Medeiros followed Canada to the beach.

At the beach, the three sat on the tailgate of Canada's truck and talked. At some point, early in the morning, Kaiama got up, moved away from the truck and began to urinate. When he finished, he turned and walked back to the truck while zipping up his pants. At this point, Canada bent down and stated to Kaiama, "I can suck 'um right here." He then told Medeiros, "I can suck yours too" and opened his mouth. Kaiama then started "trippin out" because "this guy" (Canada) "seemed like a good friend," but "he like suck cock." According to Kaiama, Medeiros then stated several times that he was going to "pound [Canada]." And Kaiama responded, "Go ahead." Medeiros then punched Canada in the face several times. Canada tried to escape by running toward the ocean; however, Medeiros and Kaiama caught him. Kaiama then punched Canada in the head a couple of times, and Medeiros kicked him in the mouth.

Canada was eventually able to get away, run into the ocean and "swim out." Medeiros then told Kaiama to "go get [Canada]," and, as instructed, Kaiama swam out after him but soon got tired and came back in. Once back on the shore, Kaiama and Medeiros began throwing rocks at Canada, who, at the time, was still in the ocean and was swimming toward the jetty of rocks in the Hale Nanea cove located next to the Kahului Harbor. Kaiama noticed that Canada was panicking. According to Kaiama, Medeiros kept throwing rocks at Canada, but he, Kaiama, only threw six rocks. At some point, after resting, Kaiama, seeing that Canada was tired, swam out into the ocean to "help him," but Canada tried to drown him so Kaiama came back to shore. Kaiama then sat down on the sand, caught his breath, and walked back to the car. When asked how he thought Canada died, Kaiama replied that he did not know. At trial, this recorded statement was played for the jury.

## C. *Third Statement*

Kaiama also made a third statement to Detective Funes sometime around 2:30 p.m. on the same day, after speaking with an attorney. Again, Detective Funes read Kaiama his *Miranda* rights and Kaiama indicated that he understood. Kaiama also signed another MPD Form 103. In his third statement, which was also played for the jury, Kaiama relayed essentially the same facts as in his previous statement. Nevertheless, Kaiama explained that he had not told the truth before and wanted to tell the truth this time. He then proceeded to clarify that he threw eight rocks at Canada—as opposed to six—and that he threw small rocks while Medeiros threw big rocks. In addition, according to Kaiama, while they were throwing rocks, Medeiros told him to "keep on throwing rocks" and to "let [Canada] drown out there." Kaiama also stated that Medeiros was the one who went into the ocean and struggled with Canada; whereas, he, on the other hand, only chased after Canada in the water.[6] Kaiama said that later, he went to

---

**6.** Kaiama stated that he chased after Canada into the water, as Canada was apparently trying to elude the attacks of Medeiros and Kaiama.

Q: Where did Jerry try to run away or not?
A: Um, da kine, he just wen' back up and then—
Q: He backing up towards where, the road or ocean?
A: Uh, be towards the road and then he wen' go on top Reggie's car and then had Reggie wen' jump on top his hood and then he wen' kick'um. And then had Jerry came on, um,

he came back on the same side, be going towards the ocean.

\* \* \* \* \* \*

Q: And then what did Jerry do?
A: Uh, be Jerry said, "Why? Why? Why?" and then, da kine, Reggie was—he as trying for tackle 'um inside the water like that.

\* \* \* \* \* \*

Q: Who's trying to tackle who?
A: Uh, be Reggie was trying for tackle him again.
Q: Let me ask you, did you go into the water?

the car after resting at a fishing shack and never swam out in to the ocean to "help" Canada.

Kaiama also stated that, when Medeiros joined Kaiama at the car, Medeiros "ripped" the stereo, speakers, some tapes, and other items out of Canada's truck. Kaiama claimed that he knew Medeiros killed Canada because, on the way home, Medeiros told him that he "drowned him," and that Canada was still "floating" in the water. When asked why he lied in his second statement, Kaiama explained that he was afraid of Medeiros. According to Kaiama, Medeiros told him that if they "get busted" Kaiama should not open his mouth and that he would come after Kaiama if he told the police anything. Kaiama also told Detective Funes that, because this was a murder case, he did not want to take the blame for what happened and that Medeiros was probably going to place all the blame on him.

### D. *Trial*

Kaiama was charged with Murder in the Second Degree, in violation of HRS § 707–701.5.[7] At trial, Detective Funes was called by the prosecution as a witness. During direct examination of Detective Funes, the prosecution played both of the tape-recorded statements for the jury. Also during direct examination of Detective Funes, and in the middle of one of the recorded statements, the prosecution, over the objection of Kaiama's attorney, was allowed briefly to bring Medeiros in front of the jury. The prosecution explained the purpose of exhibiting Medeiros to the jury as follows:

[The prosecution]: For the jury to have an opportunity to look at, observe and evaluate Mr. Medeiros' build, his size, height, weight, that sort of thing, for evaluating

A: Huh?
Q: Did you go in the water?
A: Uh, be right by shore.
Q: You told me last night that you wen' chase after Jerry in the water.
A: Yeah, but not that far.
Q: But you got all wet, didn't you?
A: Yeah.

\* \* \* \* \* \*

Third interview of Roy Kaiama with Detective Antonio Funes, Criminal Investigation Division,

regarding issues concerning the change in versions that Mr. Kaiama gave in his interviews with Detective Funes, explaining his intimidation by Mr. Medeiros as well as it relating to the physical capacity to commit the offense itself.

Almost immediately after Medeiros was exhibited to the jury, Kaiama's attorney requested that he be permitted to "examine" Medeiros in the jury's presence. The following colloquy ensued:

[Kaiama's attorney]: Your Honor, excuse me. May we approach the bench.

[The court]: Yes.

[Kaiama's attorney]: Your Honor, since the State has put on their exhibit who is Reginald Medeiros, I don't know if they've excused him as far as releasing him from their subpoena or what, but I would like to have a chance to examine the exhibit in front of the jury.

[The court]: What do you mean examine the exhibit?

[Kaiama's attorney]: If he's here as an exhibit I have a right to examine the exhibit.

[The court]: You want to ask him questions?

[Kaiama's attorney]: I won't be asking him questions in front of the jury, but I would like to have him show different parts of his body to the jury.

\* \* \* \* \* \*

[The court]: ... I want to know and I want a specific indication from the defense as to exactly what you're asking for.... I want a specific indication

Wailuku, Hawai'i, at 15–16 (Nov. 23, 1991 at 1435 hours).

7. HRS § 707–701.5 (1993) provides in relevant part:

**Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
(Bold in original.)

from the defense as to what you want to do with regard to Mr. Medeiros.

[Kaiama's attorney]: Specifically since he has been shown in front of the jury we would like to observe or look at his legs, specifically. We have reason to believe that there are bite marks on his legs which were there after this incident. I know that he was examined by the police, but I believe that all the police examined was his hands or arms.

After considering arguments from Kaiama's attorney, the prosecution, and Medeiros's attorney (who arrived at the courtroom immediately after he learned of Kaiama's attorney's request), the court denied Kaiama's attorney's request. Trial continued, and, on July 9, 1992, the jury returned a verdict of guilty. On September 9, 1992, Kaiama was sentenced to a mandatory term of life imprisonment with the possibility of parole. This timely appeal followed.

## II. *DISCUSSION*

### A. *The Prosecution's Use Of Medeiros As An Exhibit*

■ We first address Kaiama's contention that the trial court erred in allowing the prosecution to exhibit Medeiros to the jury. The question whether an individual may be introduced as an "exhibit" in front of the jury in a criminal prosecution is one of first impression in this jurisdiction. There are a number of situations in which courts in other jurisdictions have allowed a person to be exhibited in criminal prosecutions. *See generally* 29A Am.Jur.2d *Evidence* § 950–51 (1994). For example, as a general rule, courts allow the accused or third persons to be exhibited in a criminal prosecution as evidence relative to the issue of identification. *See, e.g., People v. Loyd,* 751 P.2d 1015, 1019 (Colo.App.1988) (affirming the trial court's decision requiring the defendant to stand near the jury for the purpose of comparing him to the surveillance photographs); *see also* 23 C.J.S. *Criminal Law* § 854 (1989) (citation omitted).

In this context, courts have required or permitted the accused to display, *inter alia,* scars, *see People v. Martin,* 791 P.2d 1159, 1160–61 (Colo.App.1989); tattoos, *see State v. Smith,* 170 Ariz. 481, 826 P.2d 344, 345 (App. 1992), teeth, *see State v. Summers,* 105 N.C.App. 420, 413 S.E.2d 299, 300 (1992), or other distinguishing features for the jury as evidence that he or she was· the one who committed the crime in question. Courts have also allowed comparisons to be made between· the accused and another person to show that the other person more closely resembles the "real killer." *See, e.g., People v. Diaz,* 445 N.Y.S.2d 888, 111 Misc.2d 1083 (1981). Additionally, some jurisdictions have held that a victim's exhibition of his or her injury to the jury in a criminal prosecution may be proper to show the nature and extent of the injury. *See* 29A Am.Jur.2d *Evidence* § 951 (1994) (citations omitted).

■ Although we have not had the opportunity to decide whether an individual may be exhibited to the jury in a criminal prosecution,[8] we now hold that such an exhibition is not *per se* improper on any constitutional grounds.[9] However, like any other evidence,

---

8. We note that, in *Almeida v. Correa,* 51 Haw. 594, 465 P.2d 564 (1970), we held that the exhibition of a child before the jury in a paternity case to show resemblance as proof of paternity is inadmissible demonstrative evidence because there is no probative value. *See also Kaneshiro v. Belisario,* 51 Haw. 649, 650, 466 P.2d 452, 453 (1970) (following *Almeida* with respect to the "exhibition of a child" issue).

9. Constitutional challenges to the "exhibition" of human beings in criminal trials have generally arisen in the context of the Fifth Amendment to the United States Constitution. In this context, Defendants have argued, in situations where the accused is required to stand in front of the jury, that their right against self-incrimination is violated. The courts have rejected the argument, however, because the defendant is not being compelled to "testify" against himself or herself; that being the case, there is generally no violation of the right against self-incrimination. *See Schmerber v. California,* 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966) ("[T]he privilege [against self-incrimination] is a bar against compelling communications or testimony, but that compulsion which makes a suspect or accused the source of real or physical evidence does not violate it."); *see also State v.*

the exhibition of an individual before a jury is subject to challenge on a number of evidentiary grounds depending upon the purpose for which it is being offered. Thus, as long as the purpose of exhibiting the person is relevant to an issue in dispute, *see* Hawai'i Rules of Evidence (HRE) 402 (providing that "[e]vidence which is not relevant is not admissible"),[10] and does not contravene any other traditional evidentiary requirements, *see, e.g.*, HRE 403,[11] we hold that the exhibition is otherwise admissible in a criminal prosecution.

■ In the instant case, the prosecution exhibited Medeiros, who is apparently smaller than Kaiama, to the jury for the purpose of challenging the veracity of Kaiama's third statement.[12] Specifically, the prosecution introduced Medeiros as an exhibit: (1) to cast doubt on Kaiama's explanation of the reason he told a different version of events in his third statement than he had provided in his second statement, *i.e.*, Kaiama's claim that he was afraid of Medeiros coming after him; and (2) to show that Medeiros was physically incapable of committing the crime, *i.e.*, actually drowning Canada.

### 1. *HRE 403*

On appeal, Kaiama does not specifically point either to any rules of evidence or con-

stitutional provisions to support his position that the circuit court erred in allowing Medeiros to be utilized for demonstrative purposes. Nevertheless, we glean from Kaiama's opening brief that he is claiming that the minimal probative value gained from "parading" Medeiros before the jury was outweighed by the danger of unfair prejudice and the potential of misleading the jury.[13] *See* HRE 403.[14] According to Kaiama, this is especially true in light of the fact that Kaiama did not take the stand, Medeiros was not subject to cross-examination, and other evidence tending to support Kaiama's fear of Medeiros was deemed inadmissible.

In our view, the probative value, if any, of allowing Medeiros to stand before the jury was minimal. While it is true that size and appearance are factors that may contribute to one individual's subjective fear of another, it is also true that there are a number of reasons, apart from appearance, that may cause one individual to be intimidated by another. Indeed, Medeiros' physical appearance revealed little to the jury, if anything, about his ability to cause injury or engender fear, or his propensity to engage in violence. It also revealed little about the legitimacy of

*Wyatt*, 67 Haw. 293, 303, 687 P.2d 544, 551 (1984).

Defendants have also argued that, if it is a third person being exhibited, the third person is a "witness" being used against the defendant and the defendant, therefore, has a constitutional right to cross-examine that witness. However, because the third person is not "testifying" against the defendant, courts have held that the person is not considered a witness and, thus, there is generally no right to confront or cross-examine the person. *See, e.g., People v. Morgan*, 236 Cal.Rptr. 186, 191–92, 191 Cal.App.3d 29, 38–39 (1987).

**10.** HRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**11.** *See infra* note 14.

**12.** Kaiama's third statement differed from his second statement in that he claimed: (1) he threw smaller rocks than Medeiros; (2) he never entered the water near the jetty of rocks to

"help" Canada; (3) after throwing rocks for a short period of time and resting at a fishing shack, he went back to the car; (4) it was Medeiros who entered the water near the rocks and struggled with Canada; (5) when Medeiros joined him at the car, he (Medeiros) stole the stereo out of Canada's truck and admitted killing Canada; and (6) Medeiros told Kaiama to keep his mouth shut if they "get busted" or Medeiros would come after him. *See supra* Part I.C.

**13.** Kaiama essentially contends that because certain evidence that would tend to support his fear of Medeiros was deemed inadmissible, *e.g.*, evidence of Medeiros's past convictions, it was unfair and a "denial of justice" to allow Medeiros to be exhibited to the jury.

**14.** HRE 403 provides in relevant part:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

Kaiama's subjective fear of Medeiros.[15] Moreover, we doubt that Medeiros' physical size or appearance made it any more or less probable that he was physically incapable of actually drowning Canada, who was, at the time, "panicking," "tired," and severely injured from (1) being punched and kicked in the face and body several times before he "escaped" into the water, and (2) being the target of numerous rocks thrown at him while he was in the water.[16] At the same time, allowing the prosecution to use Medeiros as an exhibit, for the purpose of demonstrating that Kaiama's fear of Medeiros was unrealistic or that Medeiros was "physically unable" to commit the crime, carried with it the potential danger of prejudicing or misleading the jury into reaching false conclusions based on his appearance alone.

Moreover, we agree with Kaiama that this potential danger is particularly true in view of the facts that: (1) Kaiama exercised his constitutional right not to take the stand and explain his fear of Medeiros; (2) the judge had already ruled that Medeiros could not be cross-examined as a witness because he was a co-defendant in this murder prosecution and also had a right not to take the stand; and (3) various other forms of evidence including, *inter alia*, evidence of Medeiros's criminal record, which may have explained Kaiama's fear of Medeiros, were held inadmissible. For these reasons, we have serious reservations about the trial court's decision to allow the prosecution to "exhibit" Medeiros.

■ However, at the same time, we are mindful that a trial court is vested with wide discretion in admitting or refusing to admit evidence at trial under HRE 403. Indeed, "[t]he determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost benefit calculus and a delicate balance between probative value and prejudicial effect." *Montalvo v. Lapez,* 77 Hawai'i 282, 301, 884 P.2d 345, 364 (citation and internal quotation marks omitted), *reconsideration denied,* 77

Hawai'i 489, 889 P.2d 66 (1994). *See also Kaeo v. Davis,* 68 Haw. 447, 454–55, 719 P.2d 387, 392 (1986) (" 'The responsibility for maintaining the delicate balance between the probative value and the prejudicial effect' . . . 'lies largely within the discretion of the trial court.' ") (quoting *State v. Iaukea,* 56 Haw. 343, 349, 537 P.2d 724, 729 (1975)). In order to constitute an abuse of discretion, it must appear that the trial court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Kealoha v. County of Hawaii,* 74 Haw. 308, 318, 844 P.2d 670, 675 (quoting *State v. Rabe,* 5 Haw. App. 251, 260–61, 687 P.2d 554, 561 (1984)), *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993).

In the instant case, the trial court was confronted with a "judgment call." While we have reservations about the trial court's "judgment" in allowing Medeiros to be used as an exhibit, *see* discussion *supra,* we also recognize that, under the abuse of discretion standard, " 'different trial judges may, on the same facts, arrive at opposite rulings without any of them being reversible on appeal.' " *See Kealoha,* 74 Haw. at 318, 844 P.2d at 675 (quoting *Rabe,* 5 Haw App. at 260–61, 687 P.2d at 561). Applying this standard, we are not convinced that the trial court abused its wide discretion in determining whether to allow evidence under HRE 403.

### 2. *Harmless Error*

■ Nevertheless, assuming, *arguendo,* that the exhibition of Medeiros constituted an abuse of discretion on the part of the trial court, for the reasons set forth below, we hold that the court's error, if any, was harmless beyond a reasonable doubt. Recently, in *State v. Holbron,* 80 Hawai'i 27, 904 P.2d 912 (1995), we stated:

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes

---

**15.** This, of course, would not be the case if Kaiama had specifically stated that he feared Medeiros because of his size.

**16.** *See supra* note 2 and accompanying text.

whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892, 114 L.Ed.2d 432] (1991); *see also State v. Suka,* 79 Hawai'i 293, 300, 901 P.2d 1272, 1279 (App.1995) ("In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine 'whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.' ") (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)).

*Holbron,* 80 Hawai'i at 32–33, 904 P.2d at 917–18 (footnote omitted).

Applying this standard, we are convinced that the trial court's error, if any, was harmless beyond a reasonable doubt. Indeed, there is overwhelming evidence in the record to support Kaiama's conviction beyond a reasonable doubt. The autopsy report revealed that the primary cause of Canada's death was drowning and a contributing cause was multiple external injuries to the head and body. In both of the recorded statements he gave to Detective Funes, Kaiama admitted to (1) punching Canada in the head a number of times after Canada had already been punched by Medeiros; (2) chasing after Canada into the water; and (3) throwing several rocks (six in the first recorded statement, eight in the second) at Canada once he was in the water. Kaiama also acknowledged that this rock-throwing prevented Canada from returning to the shore and that Canada was tired.

In the first of his two recorded statements, Kaiama admitted going into the water by the jetty of rocks (where Canada's body was found) and struggling with Canada—albeit claiming that he entered the water to "help" Canada. While Kaiama denied this fact in his third statement, *i.e.,* his second recorded statement, the jury received instructions on accomplice liability, *see* Part II.C.3. *infra,* and could have easily found Kaiama guilty on that basis regardless of whether he actually entered the water by the jetty. Thus, even if the jury accepted Kaiama's third statement in its entirety, there is still extensive evidence in the record to support a jury's finding of guilt beyond a reasonable doubt.

In addition, while the prosecution exhibited Medeiros to the jury, *inter alia,* in order to attack the veracity of Kaiama's third statement, the jury had ample reason to doubt Kaiama's credibility—with or without the "Medeiros exhibit." Standing alone, the fact that he told three contradictory stories to the police in less than twenty-four hours could easily have raised some doubt in the minds of the jurors as to Kaiama's ability or willingness to tell the truth. Moreover, in his second statement, Kaiama was able to describe and diagram, in detail, the area of the cove next to the jetty of rocks where Canada's body was located—an area that he denied recognizing from a photograph that he was shown in his third statement.[17]

Thus, in light of the overwhelming evidence in the record to support the jury's verdict, we are convinced beyond a reasonable doubt that Kaiama would not have been acquitted even if the trial court had not allowed Medeiros to be exhibited before the jury. As such, we hold, on the record as a whole, that no prejudice to Kaiama resulted from the prosecution's exhibition of Medeiros. We therefore hold that the exhibition of Medeiros did not constitute reversible error.

---

17. We also note that Kaiama's attorney had an opportunity to mitigate the effects of the prosecutions exhibition of Medeiros before the jury. In his closing argument, he explained as follows:

> Another reason why [Kaiama] was scared is because ... he knew [Medeiros] killed Gerry Canada. [Medeiros] himself says [Canada] stary floating over there. . . .

> Now you saw Reggie Medeiros come into [c]ourt and walk out of [c]ourt and the [prosecution's] saying how can [Kaiama] be scared of this guy[;] he's about the same size. Do you know Reggie Medeiros from that? Do you know what kind of person he is? Do you know anything about his background? No, you don't. . . .

### B. Examination of Medeiros by the Defense

Kaiama next argues that the trial court erred in not allowing him to examine Medeiros "as an exhibit" for bite marks or scars on his legs in the jury's presence. We disagree. According to Kaiama,

> *if* Medeiros did drown Canada, bite marks on his legs would show that Canada *may* have struggled with him under water as he drowned him. For the trial court not to even allow an examination of his legs and then state that no foundation was laid that such marks exist is denying [Kaiama] a fair trial.

Opening brief at 17 (emphases added).

At trial, Kaiama offered absolutely no evidence, aside from mere speculation, to support his claim that Canada ever bit Medeiros on either leg at any time. Furthermore, he did not offer any evidence, aside from mere speculation, that any "bite marks or scars" existed on Medeiros's legs. Even if there were marks or scars of some sort on Medeiros's legs, however, Kaiama offered no proof that they were caused by Canada. The trial court thus found, and we agree, that to allow such a display absent any foundation to support Kaiama's claims, would lead to a serious danger of misleading the jury and was therefore inadmissible under HRE 403. Consequently, we hold that the circuit court did not abuse its discretion in declining to allow Kaiama to examine Medeiros's legs in the jury's presence.[18]

### C. Jury Instructions

Kaiama argues that the trial court erred: (1) in not providing the jury with a manslaughter instruction based on emotional disturbance; and (2) in accepting the prosecution's proposed instruction with respect to accomplice liability. For the reasons set forth below, we disagree with both of these arguments.

#### 1. Standard of Review

" 'When jury instructions, or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading.' " *Holbron*, 80 Hawai'i at 32, 904 P.2d at 917 (quoting *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted))); *State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994) (citations omitted).

#### 2. Manslaughter Instruction

With respect to the jury instructions, Kaiama first contends that the trial court erred in failing to provide the jury with a manslaughter instruction.[19] "Our cases have firmly established that 'a defendant is entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be.' " *State v. Maelega*, 80 Hawai'i 172, 178–79, 907 P.2d 758, 764–65 (1995) (quoting *State v. Pinero*, 75 Haw. 282, 304, 859 P.2d 1369, 1379 (1993)) (emphasis omitted). At trial, however, Kaiama's attorney (1) neither requested a manslaughter instruction nor objected to the failure to include such an instruction; and (2) expressly responded that he did not want a manslaughter instruction when asked by the trial court. Consequently, we will not address the alleged error on appeal[20] unless the circuit court's failure to provide the in-

---

**18.** Kaiama also contends that during cross-examination of Detective Funes, the trial court erred in: (1) sustaining an objection to a question regarding Medeiros's drug dealing in the gay community; and (2) sustaining an objection to a question regarding whether the police found a gun in Medeiros's car during the execution of a search warrant. At trial, Kaiama offered no explanation as to why these objections should have been overruled. We find no merit in Kaiama's arguments with respect to either of these objections on appeal.

**19.** *See infra* note 22.

**20.** Under Hawai'i Rules of Penal Procedure Rule 30(e) (1995), "[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction ... unless [the party] objects thereto before the jury retires to consider its verdict...."

struction, *sua sponte*, amounted to plain error under Hawai'i Rules of Penal Procedure (HRPP) 52(b) (1989).[21]

'This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.... Nevertheless, *where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court.*'

*State v. Kupau*, 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994) (emphasis in original and internal citations omitted) (quoting *Kelekolio*, 74 Haw. at 514–15, 849 P.2d at 74–75). *See also Raines v. State*, 79 Hawai'i 219, 900 P.2d 1286 (1995).

Kaiama contends that because the evidence adduced at trial warranted a manslaughter instruction under HRS § 707–702,[22] the trial court committed reversible error in not, *sua sponte*, providing such an instruction. In support of this contention, Kaiama advances the following argument:

Considering the fact that [Kaiama] was only 18 years old, *did not suspect Canada of being homosexual*, and while in the process of zipping up his pants after urinating, being asked, 'I can suck um right here,' as Canada bent down on his knees and opened his mouth, *it is understandable that [Kaiama] may have reacted with violence.*

Kaiama does not argue that his conduct was anything but "intentional" or "knowing."[23] Instead, he appears to be arguing that the trial court erred in not, *sua sponte*, providing an "extreme mental or emotional disturbance" manslaughter instruction under HRS § 707–702(2).[24] For the reasons set forth below, we disagree.

An HRS § 707–702(2) emotional disturbance manslaughter instruction is simply not supported by the evidence. Under HRS § 707–702(2), it is a defense which reduces the offense from murder to manslaughter, if the defendant was, at the time of the offense, (1) under an "extreme mental or emotional disturbance"; (2) for which there was a "reasonable explanation."[25] The first prong of

---

**21.** HRPP 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

**22.** HRS § 707–702 (1993) provides in relevant part:
    **Manslaughter.** (1) A person commits the offense of manslaughter if:
    (a) He [or she] recklessly causes the death of another person; or
      \*   \*   \*   \*   \*   \*
    (2) In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, *under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.* The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he [or she] believed them to be. (Bold in original and emphasis added.)

**23.** Kaiama stated that (1) he punched Canada, (2) he chased after Canada into the water, (3) he threw rocks at Canada, and (4) he pursued Canada along the beach, while Canada attempted to escape by swimming in the ocean. These statements are consistent with the testimony of the

deputy coroner who testified that Canada died as a result of drowning, and received approximately 25 pre-death injuries which were primarily in the face, head, and back.

    Kaiama also knew that Canada was in a perilous condition. Kaiama stated that while Canada was in the ocean, trying to avoid their rock throwing, he noticed that Canada looked panicked and tired. Additionally, Kaiama also knew that by throwing rocks at Canada, it would keep him in the ocean and away from the shoreline. According to Kaiama, Medeiros emphasized this point by stating "keep on throwing rocks" and "let [Canada] drown out there."
    These facts presented at trial provide overwhelming evidence that Kaiama acted with more than mere recklessness, instead, Kaiama acted intentionally or knowingly. *See* Part II.B.2. *See also supra*, Parts I.A., I.B., and I.C.

**24.** *See supra* note 22.

**25.** "[T]he mitigating defense[ ] has been characterized as 'voluntary manslaughter' [because it] involves the intentional [or knowing] killing of another while under the influence of a reasonably induced [extreme mental or] emotional disturbance ... causing a temporary loss or normal self control." *State v. Pinero*, 70 Haw. 509, 523–24, 778 P.2d 704, 714 (1989) (citation omitted).

the test focuses "on the defendant's reaction to the stress, and requires only that the defendant be under the influence of extreme mental or emotional disturbance for which there is a 'reasonable explanation.' "[26] *State v. Seguritan*, 70 Haw. 173, 174, 766 P.2d 128, 129 (1988).

To satisfy the second prong of HRS § 707–702(2), *i.e.*, a reasonable explanation, the defendant must satisfy a subjective/objective test. *See id.* at 174, 766 P.2d at 128–29. The circumstances must be viewed as the defendant believed them to be (subjective), *see* HRS § 707–702(2); however, " '[t]he ultimate test ... is objective[.] [T]here must be a reasonable explanation or excuse for the actor's disturbance.' " *State v. Russo*, 69 Haw. 72, 77–78, 734 P.2d 156, 159 (1987) (citation omitted). As such, HRS § 707–702(2) "does not authorize mitigation on the basis of individual abnormality without any measure of the defendant against an objective standard." *Id.* at 78, 734 P.2d at 159.

In the instant case, the facts adduced at trial show absolutely no "extreme mental or emotional disturbance" on Kaiama's part. Nor does the evidence demonstrate any loss of self-control on Kaiama's part.[27] If anything, Kaiama's statements to the police indicate that he was completely under control in the situation.[28] Additionally, while Kaiama may have believed that his masculinity was threatened when Canada, whom Kaiama did not "suspect of being homosexual,"[29] unexpectedly exposed him to a sexual overture, Kaiama's actions fall far short of satisfying any objectively reasonable explanation.[30] There is absolutely no possibility that an unwanted sexual overture, in the circumstances that took place, under the facts of

this case, could provide a reasonable explanation for beating a person, driving him into the ocean, throwing rocks at him once he escaped into the ocean, and eventually drowning him.

Canada allegedly dropped to his knees and made a sexual gesture; he did not even come in close physical proximity to the defendant. Nothing in Canada's alleged actions warranted inflicting such harm.

We therefore hold that a manslaughter instruction under HRS § 707–702(2) was not supported by the evidence. *See Maelega*, 80 Hawai'i at 177, 907 P.2d at 763; *see also State v. Russo*, 69 Haw. 72, 76, 734 P.2d 156, 158 (1987) (holding that the trial court is not obligated to instruct the jury on the mitigating defense of extreme mental or emotional disturbance manslaughter if evidence to support the defense is clearly lacking); HRS § 701–115(2) (1993) ("No defense may be considered by the trier of fact unless evidence of the specified facts or facts has been presented."). Accordingly, we hold that the trial did not err in its decision not to, *sua sponte*, instruct the jury as such.

### 3. *Accomplice liability instruction*

Kaiama next contends that the trial court erred in adopting the prosecution's proposed jury instruction number 2 regarding accomplice liability. The instruction in question provided as follows:

When causing a particular result is an element of an offense, an accomplice in the conduct causing the result is an accomplice in the commission of that offense, if he acts, with respect to that result, with the state of mind that is sufficient for the commission of the offense. One who is charged with causing a particular result,

---

26. "We note that in *State v. Seguritan*, 70 Haw. 173, 766 P.2d 128 (1988), this court held that a person who invoked HRS § 707–702(2) was not required to show he or she had been exposed to 'an extremely unusual and overwhelming stress.' " *State v. Matias*, 74 Haw. 197, 205 n. 2, 840 P.2d 374, 378 n. 2 (1992) (citation omitted).

27. *See supra*, Parts I.A., I.B., and I.C.

28. During taped interviews with Detective Antonio Funes, Kaiama admitted that before Canada apparently drowned, he watched co-defendant

Medeiros assault the victim, that Kaiama, himself, chased after the victim into the water, threw rocks at the victim, and followed the victim along the shore while the victim was in the water. Third interview of Roy Kaiama with Detective Antonio Funes, Criminal Investigation Division, Wailuku, Hawaii (Nov. 23, 1991 at 1435 hours).

29. *See* opening brief at 21.

30. Clearly, Kaiama's violent reaction was not, as he contends, "understandable." *See id.*

based on his complicity in the conduct of another, cannot avoid responsibility for the result because he aided a different or more limited result as long as he acted with the required state of mind with respect to the actual result.

According to Kaiama, "Clearly this instruction when read as a whole is not a correct statement of the law." Opening brief at 25. We disagree.

The first sentence of the prosecution's proffered instruction tracks the exact language of HRS § 702–223 (1985).[31] Thus, as Kaiama concedes, the first sentence "is a correct statement of the law." *See* Opening brief at 24. Kaiama's primary gripe is with the second sentence of the instruction in question. According to Kaiama, "the second sentence of the instruction ... expands accomplice liability *much* further than intended under the law." *See id.* (emphasis added). To the contrary, the second sentence follows, almost verbatim, the language of the commentary accompanying HRS § 702–223.[32]

 It is well established that commentary accompanying the Hawai'i Penal Code (HPC) "may be used as an aid in understanding the provisions of [the HPC]...." *See* HRS § 701–105 (1993); *see also State v. Gaylord*, 78 Hawai'i 127, 139, 890 P.2d 1167, 1179 (1995) (citing, *inter alia, State v. Alo*, 57 Haw. 418, 426–27, 558 P.2d 1012, 1017 (1976), *cert. denied*, 431 U.S. 922, 97 S.Ct. 2193, 53 L.Ed.2d 235 (1977)). In addition, we have consistently acknowledged that, for the most part, jury instructions "should not merely parrot the language of the statute," but should also adequately apprise the jury, in easily understandable language, the law to be applied in its deliberation. *See State v. Nakamura*, 65 Haw. 74, 79, 648 P.2d 183, 187 (1982); *State v. Nuetzel*, 61 Haw. 531, 551, 606 P.2d 920, 932 (1980); *State v. Apao*, 59 Haw. 625, 645, 586 P.2d 250, 263 (1978).

We further note that the trial court also provided the jury with an instruction clearly explaining that intent is required to prove accomplice liability and that mere presence at the crime scene is insufficient. Thus, for the foregoing reasons, we hold that "when read and considered as a whole," instruction number 2 regarding accomplice liability was not "prejudicially insufficient, erroneous, inconsistent or misleading."

## III. CONCLUSION

In conclusion, we hold that the trial court did not commit reversible error when it: (1) allowed the prosecution to exhibit Medeiros before the jury; (2) excluded evidence of Medeiros's drug dealing in the gay community, as well as evidence that a pistol was found in Medeiros's car; (3) declined to, *sua sponte*, provide the jury with a manslaughter instruction; and (4) accepted the prosecution's proposed instruction regarding accomplice liability. We therefore affirm.

---

**31.** HRS § 702–223 (1985) provides:
   **Liability for conduct of another; complicity with respect to the result.** When causing a particular result is an element of an offense, an accomplice in the conduct causing the result is an accomplice in the commission of that offense, if he [or she] acts, with respect to that result, with the state of mind that is sufficient for the commission of the offense.

**32.** The relevant portion of the commentary on HRS § 702–223 provides as follows:

   This section is intended to make clear that a defendant charged, on the basis of his complicity in the conduct of another, with causing a particular result will not be allowed to escape accountability for the result because he [or she] solicited or aided, etc., a different or more limited result if he [or she] had the requisite state of mind with respect to the actual result.