142 P.3d 300

STATE of Hawai'i, Plaintiff–Appellee,

v.

Tracy NICHOLS, Defendant–Appellant.

No. 26870.

Intermediate Court of Appeals of Hawai'i.

Dec. 29, 2005.

Certiorari Granted Feb. 7, 2006.

James S. Tabe, Deputy Public Defender, on the briefs, for defendant-appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Tracy Nichols (Nichols) appeals from the September 7, 2004 Judgment of the Circuit Court of the Second Circuit [1] convicting him as charged of Terroristic Threatening in the First Degree, Hawaii Revised Statutes (HRS) § 707–716(1)(c) (1993) [2], and sentencing him to probation for five years. Some of the conditions of his probation are (a) imprisonment for thirty days, (b) payment of a $100 crime victim compensation fee, and (c) payment of a $150 probation services fee.

On appeal, Nichols contends that plain error occurred when the trial court (1) improperly instructed the jury on the charged offense and (2) failed to instruct the jury on the lesser included offense of Terroristic Threatening in the Second Degree, HRS § 707–717(1) (1993) [3]. We disagree and affirm.

## BACKGROUND

On September 26, 2003, in the County of Maui, State of Hawai'i, Nichols was indicted by a Maui Grand Jury charging him as follows:

> That on or about the 16th day of September, 2003, in the County of Maui, State of Hawaii, TRACY NICHOLS, with intent to terrorize, or in reckless disregard of the risk of terrorizing Nicholas Krau, a public servant, did threaten, by word or conduct, to cause bodily injury to Nicholas Krau, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(c) of the Hawaii Revised Statutes.

Nichols' first trial in the Circuit Court of the Second Circuit [4] commenced on March 29, 2004 and ended in a mistrial on March 31, 2004 because the jury was unable to reach a unanimous verdict. The second jury trial commenced on July 6, 2004.

---

1. The Honorable Shackley F. Raffetto presided over the trial proceedings and the Honorable Reinette W. Cooper presided over the sentencing hearing.

2. Hawaii Revised Statutes (HRS) § 707–715(1) (1993) states, in relevant part:
 **Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
 (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]
 HRS § 707–716 (1993) states, in relevant part:
 **Terroristic threatening in the first degree.**
 (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
 . . . .
 (c) Against a public servant[.]
 . . . .
 (2) Terroristic threatening in the first degree is a class C felony.

3. HRS § 707–717 (1993) states:
 **Terroristic threatening in the second degree.**
 (1) A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716.
 (2) Terroristic threatening in the second degree is a misdemeanor.

4. The Honorable Shackley F. Raffetto presided.

At the second trial, evidence was presented that, on September 1, 2003, at approximately 12:00 p.m., Officer Nicholas Krau (Officer Krau) of the County of Maui Police Department and a team of other police officers conducted a felony investigation of Patricia Baker (Baker) in the Kihei area of the County of Maui. Baker had rented a vehicle from a car company, the rental period had expired, and the police were looking for the vehicle. Officer Krau knew that Nichols and Baker previously had been in a relationship together and were the parents of a child in the custody of Nichols. Acting upon this information, Officer Krau, in police uniform, and the other members of the police team went to Nichols' residence to ask if Nichols knew of Baker's whereabouts. They were unable to procure any information from Nichols.

Departing from Nichols' residence, Officer Krau saw and recognized, by its looks and license plate number, the overdue rental vehicle. It was being driven by a female named Summer Plunk (Plunk). Officer Krau was familiar with Plunk from his prior dealings with her. Officer Krau then conducted a traffic stop approximately 150–200 yards from Nichols' residence to determine if someone was concealed in the overdue rental vehicle and to ask Plunk if she knew of Baker's whereabouts.

While Officer Krau was speaking to Plunk, who was being cooperative, Nichols arrived at the location of the traffic stop. According to Officer Krau's testimony, Nichols was upset and began interfering with the police investigation by instructing Plunk not to give any information to the police. In response, Officer Krau advised Nichols that they were conducting an investigation and instructed Nichols to "step back" and "stay away." Despite these commands, Nichols continued to approach Plunk's location and to instruct Plunk not to provide any further information to Officer Krau. As a result of Nichols' noncompliance and persistent interference, Officer Krau handcuffed Nichols and detained Nichols in the back seat of Officer Krau's patrol vehicle.

While Nichols was in the back of the patrol vehicle, it appeared to Officer Krau that Nichols was having a seizure. Officer Krau immediately called for the paramedics. They arrived within five to ten minutes, treated Nichols, and released him back to the police just as the police were completing their investigation. The police cited Plunk for driving without a license and released both Nichols and Plunk at the scene. The police called the car rental company to send a representative to take possession of the rental car and its keys.

Approximately two weeks later, on September 16, 2003, at about 10:40 p.m., Officer Krau went to the Tesoro Gas Express in Kihei to purchase beer and chewing gum. At the time, Officer Krau was off-duty and not in uniform. While exiting the store, Officer Krau noticed a white pickup truck parked by the entrance of the store and observed Nichols walking towards him at a fast pace. With questions omitted, the following is Officer Krau's testimony as to the events and verbal exchanges with Nichols that immediately ensued:

A And he tells me where is your ID, I want to see your ID for that beer.

. . . .

A I was kind of in shock because this gentleman was talking to me. So I was like, so. So I told him I am 21, I showed my ID to the cashier in the store, just on my way home to have a few beers.

. . . .

A He then kept coming at me, he got into my face, real close to me, and he is like, yeah, you punk bitch, what you going to do.

. . . .

A He is in my face, he is like within a foot from me, his fists are clenched, just slightly raised above his hips, he has got his chest sticking out and he is right on [sic] my face, yeah, punk bitch, what are you going to do. He was very angry, angry upset. His voice was raised.

. . . .

A At that time I felt threatened. I thought this guy is going to hit me or something.

. . . .

A So then I told him, you know, I'm off duty, it's my day off, just trying to enjoy my day off, I just want to go home and relax, I don't want to deal with you.

. . . .

A He then tells me, hey, you punk bitch, you're not shit without your gun and your badge and all your boys. He goes, I am going to kick your ass.

. . . .

A I thought he was going to kick my ass. I thought, well, he was going to assault me.

. . . .

A So then I have all this . . . beer in my hand and my cell phone, my gum, my wallet, so I am trying to get to my vehicle. I just wanted to leave. I wanted to get out of the area. I didn't want to deal with him. I didn't want to-it was my day off. I was just trying to enjoy my day off.

. . . .

A So I am side-stepping. I don't want to turn around and walk away from him and give him an opportunity to strike me from behind. So I am kind of keeping my eyes on him and I am sidestepping to my vehicle, trying to get to my vehicle so I can, you know, just go.

. . . .

A He is following, walking, mirroring as-he is walking alongside as I am walking, staying right in my face. Same aggression, just fists clenched, he is still aggressive, he is speaking loudly, aggressive tone of voice.

. . . .

A . . . [Y]eah, he continued calling me a punk bitch, telling me he is going to fuck me up. . . .

. . . .

A I was totally convinced I was going to get assaulted. This guy was—he was going to attempt to kick my ass.

. . . .

A I continue sidestepping to my vehicle. I am not trying to provoke [Nichols] in any way, I am not saying anything, I am just going to my vehicle.

When Officer Krau reached his vehicle, Nichols stopped following Officer Krau and returned to and entered the white pickup truck. Officer Krau did not know who else was in the white truck and had the following concerns: "There could have been other people in the vehicle just waiting for an opportunity to jump out and attack me, assault me. If they had weapons in there, I had no idea what was going to happen." As Nichols departed from the Tesoro Gas Express, he continued to yell, "punk B–I–T–C–H" at Officer Krau. Officer Krau was never touched by Nichols.

Officer Krau departed in the opposite direction from his home because he did not know if Nichols was "waiting, trying to set me up, waiting for me to leave, . . . follow me to my house, or whether [Nichols] was going to jump out or, you know, harm me or my family." Officer Krau then placed a call to his residence, spoke to his father, informed his father of his encounter and prior dealings with Nichols. Officer Krau also advised his father to watch out for a white pickup truck. Officer Krau then called a few co-workers, including his brother, to notify them of what had occurred between Nichols and himself in order to establish Nichols as the prime suspect should "something happen" to Officer Krau or his family members. Officer Krau acknowledged that he should have notified central dispatch immediately to report the incident per proper police procedure, but, in fact, did not do so until returning to work three days later on September 19, 2003.

Nichols did not testify.

On July 7, 2004, during the in-chambers settlement of jury instructions, the following discussion regarding the offense of Terroristic Threatening in the Second degree took place, in relevant part:

[PROSECUTOR]: Perhaps we could put something on the record, Your Honor, regarding the Court's finding [sic] that there is no lesser included offense of TT [Terroristic Threatening] 2 in this case. We did that the last trial. The only difference between the TT 1 and the TT 2 is whether or not the [victim] was a police officer, public servant. And I don't think

there has been any evidence indicating that [Officer Krau] was—

THE COURT: To the contrary.

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: I agree.

THE COURT: So we will make a finding [sic] that there is no included offense.

Without objection, the court instructed the jury, in relevant part, as follows:

Number 16: In the Indictment, the defendant, Tracy Nichols, is charged with the offense of Terroristic Threatening in the First Degree.

A person commits the offense of Terroristic Threatening in the First Degree if, with the intent to terrorize or in reckless disregard of the risk of terrorizing a public servant, he threatens, by word or conduct, to cause bodily injury to a public servant.

There are four elements of the offense of Terroristic Threatening in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These four element[s] are: One, that on or about the 16th day of September, 2003, in the County of Maui, State of Hawaii, the defendant, Tracy Nichols, intentionally threatened or recklessly disregarded the risk of threatening, by word or conduct, to cause bodily injury to another person, to wit, Nicholas Krau; and, two, that the defendant, Tracy Nichols, intended, knew or recklessly disregarded a substantial and unjustifiable risk, that the person threatened was a public servant; and, three, that the defendant, Tracy Nichols, did so with the intent to terrorize or in reckless disregard of the risk of terrorizing Nicholas Krau; and, four, that Nicholas Krau was a public servant.

Number 17: A threat does not include any statement which, when taken in context, is not a true threat because it is conditional or made in jest.

An alleged true threat is one that is objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered.

True threats must be so unambiguous and have such immediacy that they convincingly express an intention of being carried out.

A threat is, on its face and in the circumstances in which it is made, so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

Number 18: Terrorize means to cause another person to have serious alarm for his or her personal safety.

Number 19: Actual terrorization is not a material element of terroristic threatening, although, it is evidence of the occurrence of its material elements.

Number 20: Law enforcement officer includes a police officer.

During its deliberations, the jury did not submit any questions to the trial court. The jury found Nichols guilty as charged.

## STANDARDS OF REVIEW

### A. Jury Instructions

Hawai'i Rules of Penal Procedure (HRPP) Rule 30(f) (2005) states, in relevant part:

No party may assign as error the giving or the refusal to give, or the modification of, an instruction, whether settled pursuant to subdivision (b) or subdivision (c), of this rule, unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

HRPP Rule 52 (2005) states:

(a) *Harmless error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

(b) *Plain error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

HRPP Rules 30(f) and 52 are based on the Federal Rules of Criminal Procedure (FRCP) Rules 30(d) and 52. FRCP Rule 30(d) provides:

**(d) Objections to Instructions.** A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).

FRCP Rule 52 provides:

**Harmless Error And Plain Error**

**(a) Harmless Error.** Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

**(b) Plain Error.** A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.

The clearest explanation of the real meaning of the language of FRCP Rule 52 is the following quote from a United States Supreme Court opinion:

We granted certiorari to clarify the standard for "plain error" review by the courts of appeals under Rule 52(b). 504 U.S. 908, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992).

### II

"No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944). Federal Rule of Criminal Procedure 52(b), which governs on appeal from criminal proceedings, provides a court of appeals a limited power to correct errors that were forfeited because not timely raised in district court. The Rule has remained unchanged since the original version of the Criminal Rules, and was intended as "a restatement of existing law." Advisory Committee's Notes on Fed.Rule Crim.Proc. 52, 18

U.S.C.App., p. 833. It is paired, appropriately, with Rule 52(a), which governs non-forfeited errors. Rule 52 provides:

"(a) HARMLESS ERROR. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) PLAIN ERROR. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Although "[a] rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with ... the rules of fundamental justice," *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941), the authority created by Rule 52(b) is circumscribed. There must be an "error" that is "plain" and that "affect[s] substantial rights." Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

### A

Rule 52(b) defines a single category of forfeited-but-reversible error. Although it is possible to read the Rule in the disjunctive, as creating two separate categories— "plain errors" and "defects affecting substantial rights"—that reading is surely wrong. See *Young,* 470 U.S., at 15, n. 12, 105 S.Ct., at 1046, n. 12 (declining to adopt disjunctive reading). As we explained in *Young,* the phrase "error or defect" is more simply read as "error." *Ibid.* The forfeited error "may be noticed" only if it is "plain" and "affect[s] substantial rights." More precisely, a court of appeals may *correct* the error (either vacating for a new

trial, or reversing outright) only if it meets these criteria. The appellate court must consider the error, putative or real, in deciding whether the judgment below should be overturned, but cannot provide that remedy unless Rule 52(b) applies (or unless some other provision authorizes the error's correction, an issue that respondents do not raise).

The first limitation on appellate authority under Rule 52(b) is that there indeed be an "error." Deviation from a legal rule is "error" unless the rule has been waived. For example, a defendant who knowingly and voluntarily pleads guilty in conformity with the requirements of Rule 11 cannot have his conviction vacated by court of appeals on the grounds that he ought to have had a trial. Because the right to trial is waivable, and because the defendant who enters a valid guilty plea waives that right, his conviction without a trial is not "error."

Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); see, e.g., *Freytag v. Commissioner*, 501 U.S. 868, 894, n. 2, 111 S.Ct. 2631, 2647, n. 2, 115 L.Ed.2d 764 (1991) (SCALIA, J., concurring in part and concurring in judgment) (distinguishing between "waiver" and "forfeiture"); Spritzer, Criminal Waiver, Procedural Default and the Burger Court, 126 U.Pa. L.Rev. 473, 474–477 (1978) (same); Westen, Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure, 75 Mich.L.Rev. 1214, 1214–1215 (1977) (same). Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. See, *e.g.*, 2 W. LaFave & J. Israel, Criminal Procedure § 11.6 (1984) (allocation of authority between defendant and counsel); Dix, Waiver in Criminal Procedure: A Brief for More Careful Analysis,

55 Texas L.Rev. 193 (1977) (waivability and standards for waiver). Mere forfeiture, as opposed to waiver, does not extinguish an "error" under Rule 52(b). Although in theory it could be argued that "[i]f the question was not presented to the trial court no error was committed by the trial court, hence there is nothing to review," Orfield, The Scope of Appeal in Criminal Cases, 84 U.Pa.L.Rev. 825, 840 (1936), this is not the theory that Rule 52(b) adopts. If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection.

The second limitation on appellate authority under Rule 52(b) is that the error be "plain." "Plain" is synonymous with "clear" or, equivalently, "obvious." See *Young, supra*, 470 U.S., at 17, n. 14, 105 S.Ct. at 1047, n. 14; *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). We need not consider the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified. At a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.

The third and final limitation on appellate authority under Rule 52(b) is that the plain error "affec[t] substantial rights." This is the same language employed in Rule 52(a), and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings. See, *e.g.*, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–257, 108 S.Ct. 2369, 2373–2374, 101 L.Ed.2d 228 (1988); *United States v. Lane*, 474 U.S. 438, 454–464, 106 S.Ct. 725, 734–739, 88 L.Ed.2d 814 (1986) (Brennan, J., concurring in part and dissenting in part); *Kotteakos v. United States*, 328 U.S. 750, 758–765, 66 S.Ct. 1239, 1244–1248, 90 L.Ed. 1557 (1946). When the defendant has made a timely objection to an error and Rule 52(a) applies, a court of appeals normally engages in a specific analysis of

the district court record—a so-called "harmless error" inquiry—to determine whether the error was prejudicial. Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial. See *Young, supra*, 470 U.S., at 17, n. 14, 105 S.Ct., at 1047 n. 14 ("[F]ederal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error . . . had [a] prejudicial impact on the jury's deliberations"). This burden shifting is dictated by a subtle but important difference in language between the two parts of Rule 52: While Rule 52(a) precludes error correction only if the error "does *not* affect substantial rights" (emphasis added), Rule 52(b) authorizes no remedy unless the error *does* "affec[t] substantial rights." See also Note, Appellate Review in a Criminal Case of Errors Made Below Not Properly Raised and Reserved, 23 Miss.L.J. 42, 57 (1951) (summarizing existing law) ("The error must be real and such that it probably influenced the verdict . . .").

We need not decide whether the phrase "affecting substantial rights" is always synonymous with "prejudicial." See generally *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (constitutional error may not be found harmless if error deprives defendant of the " 'basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair' ") (quoting *Rose v. Clark*, 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)). There may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome, but this issue need not be addressed. Nor need we address those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice. Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the "affecting substantial rights" prong of Rule 52(b).

**B**

Rule 52(b) is permissive, not mandatory. If the forfeited error is "plain" and "affect[s] substantial rights," the court of appeals has authority to order correction, but is not required to do so. The language of the Rule ("may be noticed"), the nature of forfeiture, and the established appellate practice that Congress intended to continue all point to this conclusion. "[I]n criminal cases, where the life, or as in this case the liberty, of the defendant is at stake, the courts of the United States, in the exercise of a sound discretion, may notice [forfeited error]." *Sykes v. United States*, 204 F. 909, 913–914 (C.A.8 1913). Accord, *Crawford v. United States*, 212 U.S. 183, 194, 29 S.Ct. 260, 264, 53 L.Ed. 465 (1909); former Supreme Court Rule 27.6 (1939) (cited in Advisory Committee's Notes on Fed.Rule Crim.Proc.Rule 52(b), 18 U.S.C.App., p. 833) (" '[T]he court, at its option, may notice a plain error not assigned or specified' ").

We previously have explained that the discretion conferred by Rule 52(b) should be employed " 'in those circumstances in which a miscarriage of justice would otherwise result.' " *Young*, 470 U.S., at 15, 105 S.Ct., at 1046 (quoting *Frady, supra*, 456 U.S., at 163, n. 14, 102 S.Ct., at 1592, n. 14). In our collateral-review jurisprudence, the term "miscarriage of justice" means that the defendant is actually innocent. See, *e.g., Sawyer v. Whitley*, 505 U.S. 333, 339–340, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). The court of appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant, see, *e.g., Wiborg v. United States*, 163 U.S. 632, 16 S.Ct. 1127, 41 L.Ed. 289 (1896), but we have never held that a Rule 52(b) remedy is *only* warranted in cases of actual innocence.

Rather, the standard that should guide the exercise of remedial discretion under

Rule 52(b) was articulated in *United States v. Atkinson,* 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936). The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.,* at 160, 56 S.Ct., at 392. As we explained in *Young,* the "standard laid down in *United States v. Atkinson* [was] codified in Federal Rule of Criminal Procedure 52(b)," 470 U.S., at 7, 105 S.Ct., at 1042, and we repeatedly have quoted the *Atkinson* language in describing plain-error review, see *id.,* at 15, 105 S.Ct., at 1046; *Frady, supra,* 456 U.S., at 163, n. 13, 102 S.Ct., at 1592, n. 13; *Silber v. United States,* 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) *(per curiam );* *Johnson v. United States,* 318 U.S. 189, 200, 63 S.Ct. 549, 554, 87 L.Ed. 704 (1943); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940); see also *Connor v. Finch,* 431 U.S. 407, 421, n. 19, 97 S.Ct. 1828, 1837, n. 19, 52 L.Ed.2d 465 (1977) (civil appeal). An error may "seriously affect the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence. Conversely, a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory. *United States v. Olano,* 507 U.S. 725, 731–737, 113 S.Ct. 1770, 1776–1779, 123 L.Ed.2d 508 (1993).[5]

In a 1999 case involving jury instructions, the Hawai'i Supreme Court stated, in relevant part:

"As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error." *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998); see also *State v. Kupau,* 76 Hawai'i 387, 392, 879 P.2d 492, 497 (1994); *State v. Pinero,* 75 Haw. 282, 291–2, 859 P.2d 1369, 1374 (1993). "[T]his

court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *Sawyer,* 88 Hawai'i at 330, 966 P.2d at 642 (citing *State v. Fox,* 70 Haw. 46, 56, 760 P.2d 670, 676 (1988)).

This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system-that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*State v. Kelekolio,* 74 Haw. 479, 514–15, 849 P.2d 58, 74–75 (1993) (quoting *Fox,* 70 Haw. at 55–56, 760 P.2d at 675–76). If the substantial rights of the defendant have been affected adversely, the error will be deemed plain error. See *Sawyer,* 88 Hawai'i at 330, 966 P.2d at 642; *Pinero,* 75 Haw. at 291–2, 859 P.2d at 1374.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." [*State v.]Arceo,* 84 Hawai'i 1,] 11, 928 P.2d [843,] 853 [ (1996) ] (citations and internal quotation marks omitted); see also *State v. Kupau,* 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994). If the instructions requested by the parties are inaccurate or incomplete but are necessary "in order for the jury to 'have a clear and correct understanding of what it is that they are to decide[,]' " then the trial court has the duty either to correct any defects or to fashion its own instructions. *State v. Okumura,* 78 Hawai'i 383, 411, 894 P.2d 80, 108 (1995) (citations omitted); accord *State v. Kinnane,* 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995).

Nevertheless, the "trial court is not required to instruct the jury in the exact

---

5. The opinion by the United States Supreme Court in *United States v. Olano,* 507 U.S. 725, 731–737, 113 S.Ct. 1770, 1776–1779, 123 L.Ed.2d 508 (1993), does not state how much discretion, if any, a court of appeals has to de-

cline to correct a plain forfeited error affecting substantial rights when the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case." *State v. Apao,* 59 Haw. 625, 645, 586 P.2d 250, 263 (1978), subsequent resolution, 66 Haw. 682, 693 P.2d 405 (1984). Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. *State v. Robinson,* 82 Hawai'i 304, 310, 922 P.2d 358, 364 (1996). If that standard is met, however, "the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal." *Pinero,* 75 Haw. at 292, 859 P.2d at 1374. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews de novo. *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994).

*Sawyer,* 88 Hawai'i at 330, 966 P.2d at 642.

Furthermore,

[e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. See *Yates v. Evatt,* 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432] . . . (1991)[.]

*Arceo,* 84 Hawai'i at 11–12, 928 P.2d at 853–54 (quoting *State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917, reconsideration denied 80 Hawai'i 187, 907 P.2d 773 (1995) (some citations omitted) (brackets in original) (emphasis deleted)); see also *State v. Loa,* 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996); *State v. Robinson,* 82

Hawai'i 304, 310–11, 922 P.2d 358, 364–65 (1996).

*State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997).

*State v. Vanstory,* 91 Hawai'i 33, 42–43, 979 P.2d 1059, 1068–69 (1999) (internal quotation marks, citations, and brackets omitted).

■ We will now note the relevant parts of this Hawai'i precedent and comment upon some of those parts. First, this precedent notes that "[a]s a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error."

■ Second, this precedent notes that "this court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." Only the "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings" purpose is stated in *United States v. Olano.* The "to serve the ends of justice, and to prevent the denial of fundamental rights" purposes have been added.

■ Third, this precedent notes that "[t]his court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system-that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." In other words, absent objection by trial counsel, the trial judge need not be concerned with an HRPP Rule 52(a) non-harmless error. The only duty of the trial judge is to avoid plain error which an appellate court may, in its discretion, use as a basis for vacating or reversing the trial court's judgment.

Fourth, this precedent notes that "the real question becomes whether there is a reasonable possibility that error may have contributed to conviction"; and "[i]f there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." In other words, while discussing HRPP Rule 52(b), this precedent applies the

HRPP Rule 52(a) harmless error non-discretionary standard rather than the HRPP Rule 52(b) plain error discretionary standard. The standard applied differs from the *United States v. Atkinson* federal standard which says that "[t]he Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 at 736, 113 S.Ct at 1779 (quoting *Atkinson*, 297 U.S. at 160, 56 S.Ct. at 392). In applying the HRPP Rule 52(a) harmless error non-discretionary standard rather than the HRPP Rule 52(b) plain error discretionary standard, the precedent fails to recognize that "a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." *Olano*, 507 U.S. at 737, 113 S.Ct. at 1779.

■ Fifth, this precedent notes that [i]f the instructions requested by the parties are inaccurate or incomplete but are necessary "in order for the jury to 'have a clear and correct understanding of what it is that they are to decide[,]'" then the trial court has the duty either to correct any defects or to fashion its own instructions. Contrary to what is stated in the federal precedent above, this statement suggests that (a) HRPP Rule 30(f) and the rule "that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes" do not apply with respect to jury instructions, and (b) the trial court's duty with respect to jury instructions is greater than its duty with respect to some of the other aspects of the trial. It indicates that (a) it is the trial court's duty to accurately and completely instruct the jury, and (b) the defendant cannot suffer any harm from defense counsel's actions or inactions with respect to jury instructions. Such a precedent has merit. Jury instructions should not be the subject of counsel's tactical decisions. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. Unlike the situation with a "forfeited error[,]" the State, rather than the defendant,

bears the burden of persuasion with respect to prejudice. If the duty to give the right jury instructions is assigned to the trial court, (a) the standard of review for an erroneous jury instruction will always be the harmless error non-discretionary standard, and will never be the plain error discretionary standard, and much uncertainty will be avoided; (b) an erroneous jury instruction will never be a basis for defendant's assertion that he/she has been the a victim of the ineffective assistance of counsel; and (c) abuses of the plain error discretionary standard of review will be avoided.

In 2001, in *State v. Astronomo*, 95 Hawai'i 76, 18 P.3d 938 (App.2001), this court stated, in relevant part:

> In the past, the Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) concepts of "plain error" (court erred but counsel failed counsel's duty to object) or the HRPP Rule 52(a) concepts of "harmless error" (court erred and counsel did not have a duty to object or had a duty and did not fail it) have been applied to jury instructions, depending on whether counsel objected. *State v. Valentine*, 93 Hawai'i 199, 205, 998 P.2d 479, 485 (2000); *State v. Kaiama*, 81 Hawai'i 15, 911 P.2d 735 (1996). But, as is noted in *Valentine*,
>
>> it may be plain error for a trial court to fail to give an ... instruction even when neither the prosecution nor the defendant have requested it ... because ... 'the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.' [*State v.] Arceo*, 84 Hawai'i 1,] at 33, 928 P.2d [843,] at 875 [ (1996) (citations omitted) ].
>
> *Valentine*, 93 Hawai'i at 205, 998 P.2d at 485.
>
> In light of the above, with respect to jury instructions, the distinction between "harmless error" and "plain error" is a distinction without a difference. We conclude that the standard of review applicable in all cases when jury instructions or the omission thereof are challenged on appeal is as follows:
>
>> [T]he standard of review is whether, when read and considered as a whole, the instructions given are prejudicially

insufficient, erroneous, inconsistent, or misleading.

[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Cabrera,* 90 Hawai'i 359, 364–65, 978 P.2d 797, 802–03 (1999) (citations and internal quotations omitted).

95 Hawai'i at 82, 18 P.3d at 944.

In 2003, in *State v. Iuli,* 101 Hawai'i 196, 203–04, 65 P.3d 143, 150–51 (2003), the Hawai'i Supreme Court stated, in relevant part:

B. *Jury instructions*

 " 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading,' " *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995). . . .

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction. . . .

*State v. Jenkins,* 93 Hawai'i 87, 99–100, 997 P.2d 13, 25–26 (2000) (some citations omitted).

*State v. Lagat,* 97 Hawai'i 492, 495–96, 40 P.3d 894, 898–99 (2002) (some citations omitted) (brackets in original).

Nevertheless, the "trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case." *State v. Apao,* 59 Haw. 625, 645, 586 P.2d 250, 263 (1978), *subsequent resolution,* 66 Haw. 682, 693 P.2d 405 (1984). Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. *State v. Robinson,* 82 Hawai'i 304, 310, 922 P.2d 358, 364 (1996). If that standard is met, however, "the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal." *[State v.] Pinero,* 75 Haw. 282,] 292, 859 P.2d [1369,] 1374 [ ( (1993) ]. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews de novo. *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i [sic] 494, 504, 880 P.2d 169, 179 (1994).

*State v. Vanstory,* 91 Hawai'i 33, 43, 979 P.2d 1059, 1069 (1999) (quoting *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (some brackets added)).

"Jury instructions to which no objection has been made at trial will be reviewed only for plain error." *State v. Aganon,* 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (internal citations and quotation marks omitted), *reconsideration denied,* 97 Hawai'i 299, 36 P.3d 1269 (2001).

C. *Plain error*

 "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (citations omitted); *see also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed

although they were not brought to the attention of the court.").

■ As noted, in *Iuli*, the Hawai'i Supreme Court ruled that "[j]ury instructions to which no objection has been made at trial will be reviewed only for plain error." Without explanation, the *Iuli* opinion (a) ignored this court's opinion in *Astronomo*, and (b) cited to *Vanstory* as precedent while (i) ignoring the part of *Vanstory* that states,

> If the instructions requested by the parties are inaccurate or incomplete but are necessary "in order for the jury to 'have a clear and correct understanding of what it is that they are to decide[,]' " then the trial court has the duty either to correct any defects or to fashion its own instructions.

We have no way of knowing if this was done intentionally. Whether or not this was done intentionally, the *Iuli* opinion causes us to conclude that in Hawai'i, absent an objection in accordance with HRPP Rule 30(f), "[n]o party may assign as error the giving or the refusal to give, or the modification of, an instruction." However, even when a party fails to object to an instruction in accordance with HRPP Rule 30(f), appellate courts shall apply the HRPP Rule 52(b) "plain error" standard of review. We leave open the question of whether that standard is that (a) we may recognize plain error when the error committed affects substantial rights of the defendant, or (b) we will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights, or (c) both. We further conclude that, absent an objection by a party in accordance with HRPP Rule 30(f), the trial court's duty "either to correct any defects [in the requested instructions] or to fashion its own instructions" is limited to the duty to avoid only plain error rather than all non-harmless error.

## B. Included Offenses

■ "[T]rial courts must instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]' " *State v. Haanio*, 94 Hawai'i 405, 413, 16 P.3d 246, 254 (2001) (quoting HRS § 701–109(5) (1993)).

## RELEVANT STATUTE

HRS § 710–1000 (1993) states, in relevant part:

(13) "Law enforcement officer" means any public servant, whether employed by the State or subdivisions thereof or by the United States, vested by law with a duty to maintain public order or, to make arrests for offenses or to enforce the criminal laws, whether that duty extends to all offenses or is limited to a specific class of offenses;

. . . .

(15) "Public servant" means any officer or employee of any branch of government, whether elected, appointed, or otherwise employed, and any person participating as advisor, consultant, or otherwise, in performing a governmental function, but the term does not include jurors or witnesses[.]

## POINTS OF ERROR

First, Nichols argues that the trial court's jury instructions were plain error because they failed to (a) define the term "public servant"; (b) instruct the jury that (i) the Plaintiff–Appellee, State of Hawai'i (State), must prove that Officer Krau was a "public servant" at the time the threat was uttered, and (ii) when deciding whether the alleged threat was related to, or the result of, Officer Krau's performance as a public servant, the jury must understand that "persons should also not be automatically considered as public servants when they are not on duty or not engaged in the performance of their official duties"; and (c) instruct the jury that it may consider the attributes of the defendant and the victim in assessing whether the remarks of the former were a true threat.

Second, Nichols argues that the offense of Terroristic Threatening in the Second Degree, HRS § 707–717, is a lesser included offense and the trial court erred when it failed to so instruct the jury.

## DISCUSSION

### I.

#### A.

▮ The trial court told the jury that the prosecution "must prove that Nicholas Krau was a public servant." It also told the jury that "[l]aw enforcement officer includes police officer." Without explanation, the trial court did not instruct the jury as to the definition of "public servant". It erred when it failed to tell the jury that a finding that Officer Krau was a "law enforcement officer"/"police officer" was a finding that Officer Krau was a "public servant".

#### B.

▮ Nichols argues that "persons should also not be automatically considered as public servants when they are not on duty or not engaged in the performance of their official duties[.]" More specifically, he argues that Officer Krau should not be considered a public servant at the time of the threats because he was off-duty, in plain clothes, and at a convenience store.

Nichols further argues that, to find a person guilty of Terroristic Threatening in the First Degree under HRS § 707–716(1)(c), the trier-of-fact must find a nexus between the threat and the official duties of the public servant. In other words, the jury must determine that the threat by Nichols was related to, or the result of, the performance of Officer Krau's official duties. "[I]f the jury was unable to determine whether the threats were due to Krau's status as a police officer, then the jury should have been required to acquit Nichols of the charged offense." In light of the following precedent, we disagree.

We agree with Kuhia that the legislative history of HRS § 707–716(1)(c) indicates that the Legislature intended the term "public servant" found in that statute to be construed consistently with the definition in HRS § 710–1000(15). We disagree, however, with Kuhia's interpretation of HRS § 710–1000(15) as meaning that a person qualifies as a public servant only during the times he or she is actively performing a governmental function and acting within the scope of his or her employment.

The definition of "public servant" in HRS § 710–1000(15) contains three clauses, as diagrammed below:

"Public servant" means [1] any officer or employee of any branch of government, whether elected, appointed, or otherwise employed, **and** [2] any person participating as advisor, consultant, or otherwise, **in performing a governmental function,** but [3] the term does not include jurors or witnesses[.]

(Emphasis and bracketed numbers added.) The term "governmental function" is further defined in HRS § 710–1000(6) (1993) as including "any activity which a public servant is legally authorized to undertake on behalf of the government."

Kuhia apparently reads the phrase "in performing a government function" as modifying both clause [1] and clause [2]. We believe a far more natural reading of the statute is that this phrase only modifies clause [2]. Accordingly, we conclude that under HRS § 710–1000(15) any "officer or employee of any branch of government" qualifies as a public servant.

*State v. Kuhia,* 105 Hawai'i 261, 269–70, 96 P.3d 590, 598–99 (App.2004) (emphases in original, footnote omitted).

#### C.

▮ In *State v. Valdivia,* 95 Hawai'i 465, 479, 24 P.3d 661, 675 (2001), the Hawai'i Supreme Court stated, in relevant part:

Unlike harassment, which requires a "likely" response to a defendant's remark from the person to whom the remark is directed, terroristic threatening does not, by its terms, require that the complainant actually be terrorized. See *State v. Alston,* 75 Haw. 517, 540, 865 P.2d 157, 169 (1994) ("the offense of terroristic threatening does not require that the person to whom the threats are directed actually be terrorized by the threats"). Nonetheless, as we have said, in order for an utterance to constitute a "true threat," it must be objectively susceptible to inducing fear of bodily injury in a reasonable person at

whom the threat is directed and who is familiar with the circumstances under which the threat is uttered. See *supra* section III.A.2.' That being the case, the particular attributes of the defendant and the subject of the threatening utterance are surely relevant in assessing whether the induced fear of bodily injury, if any, is objectively reasonable.

Thus, while not directly on point, given the distinction between the offenses of harassment and terroristic threatening, the gist of *Doe* nevertheless applies in the context of a prosecution for terroristic threatening. As such, the jury in the present matter should have been instructed that it could consider relevant attributes of both the defendant and the subject of the allegedly threatening utterance in determining whether the subject's fear of bodily injury, as allegedly induced by the defendant's threatening utterance, was objectively reasonable under the circumstances in which the threat was uttered. Because we cannot say that the failure of the circuit court to so instruct the jury in the present matter did not contribute to Valdivia's conviction of first degree terroristic threatening, we hold that this omission yields an alternative ground for remanding Valdivia's first degree terroristic threatening conviction for a new trial.

The relevant holding in *Valdivia* was based in large part on a prior case, *In re Doe,* 76 Hawai'i 85, 869 P.2d 1304 (1994), in which the Hawai'i Supreme Court reasoned that when the offense of harassment is committed against a police officer, the risk of provoking a response from the officer is considered against "the officer's training and professional standard of restrained behavior." *Id.,* at 96, 869 P.2d at 1315. Essentially, the Hawai'i Supreme Court has raised the threshold when the victim of the harassment or the threat is a police officer.

The State concedes and we agree that the trial court erred when it failed to provide the jury with the "relevant attributes" instruction as required by *Valdivia.*

### D.

■ As noted above, the instructions to the jury contain two errors. These errors are not plain errors unless they prejudicially affected Nichols' substantial rights by affecting the outcome of the case to his detriment. The "public servant" error was not a plain error. Assuming the "relevant attributes" error was a plain error, we decline to exercise our remedial discretion.

### II.

■ Nichols asserts that the trial court erred when it failed to instruct the jury on the lesser included offense of Terroristic Threatening in the Second Degree, HRS § 707–717. He contends that

[i]n the instant case, even though the defense agreed that there was no dispute as to whether Krau was a police officer, and hence a public servant, there was a rational basis on the evidence for a verdict acquitting Nichols of terroristic threatening in the first degree and convicting him of terroristic threatening in the second degree. The jury, if it had been properly instructed on the terroristic threatening in the first degree, see *Point of Error No. 1, supra,* the jury [sic] could have acquitted Nichols of terroristic threatening in the first degree[,] . . . as there was evidence that Krau, *at the time* of the alleged threat, was off duty and the alleged remarks were not the *result of, or related to,* Krau's performance of his official duties. In other words, there was rational basis in the evidence that, at the time of the alleged threat, Krau was not a public servant within the context of HRS § 707–716(1)(c).

This point has no merit because the Hawai'i Supreme Court has held, upon facts directly on point, that

the trial court's failure to give appropriate included offense instructions requested by a party constitutes error, as does the trial court's failure to give an appropriate included offense instruction that has not been requested. Such error, however, is harmless when the jury convicts the defendant of the charged offense or of an in-

cluded offense greater than the included offense erroneously omitted from the instructions. The error is harmless because jurors are presumed to follow the court's instructions, and, under the standard jury instructions, the jury, in reaching a unanimous verdict as to the charged offense or as to the greater included offense, would not have reached, much less considered, the absent lesser offense on which it should have been instructed.

*Haanio*, 94 Hawai'i at 415–416, 16 P.3d at 256–257 (2001) (internal citations, brackets, and footnotes omitted).

■ This point also has no merit because, although there was evidence that Krau, at the time of the alleged threat, was off duty, (a) there was no evidence that the alleged remarks were not the result of, or related to, Krau's performance of his official duties, and (b) even if there was such evidence, it would have been irrelevant.

## CONCLUSION

Accordingly, we affirm the September 7, 2004 Judgment.

